IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 5, 2024 Session

## STATE OF TENNESSEE v. LAMIRACLE SCOTT

**Appeal from the Criminal Court for Shelby County
Nos. C2100383, 21-00108  James M. Lammey, Judge**

_____

## No. W2022-01145-CCA-R3-CD

_____

Defendant, Lamiracle Scott, appeals from her Shelby County conviction for first degree premediated murder, for which she received a life sentence.  Defendant contends: (1) that the evidence is insufficient to support her conviction; (2) that the trial court abused its discretion by denying her request for a continuance; and (3) that she is entitled to plain error relief due to a juror allegedly sleeping during trial.  Following a thorough review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and JILL BARTEE AYERS, JJ., joined.

Josie S. Holland (on appeal); and Coleman W. Garrett and Alex Jones (at trial), Memphis, Tennessee, for the appellant, Lamiracle Scott.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Steve Mulroy, District Attorney General; and Greg Gilbert and Venecia Patterson, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### I. Factual and Procedural Background

This case arises from the shooting death of the victim, Taronza Owens, Sr., on August 22, 2020.  The Shelby County Grand Jury subsequently indicted Defendant in

connection with the death, charging her with first degree premeditated murder.[1]  The case proceeded to trial in May 2022.

Glenda Owens testified that the victim was her nephew and that he was twenty-three years old at the time of his death.  Ms. Owens said that she had not known Defendant and that she had been unaware of the victim's relationship with Defendant.  She said that, to her knowledge, the victim lived at home with his mother and father prior to his death.  Ms. Owens testified that, on the day of the offense, she learned from the victim's father that the victim had been shot and that he had been transported to the hospital.  Ms. Owens stated that she went to the hospital, where the family was eventually told that the victim had passed away.

Shante Williams testified that she began a romantic relationship with the victim in January 2020, and that their relationship lasted until August 22, 2020—the day of the victim's death.  Ms. Williams stated that she and the victim lived together from March 2020, until July 2020, when the victim told her he needed to move in with his grandparents because someone tried to break into his grandparents' home.

Ms. Williams stated that, on the night of August 22, 2020, she was at home in bed but could not sleep.  She testified:

> So, I jumped up and when I look[ed] at my phone, I had a message request from [Defendant].  And when I clicked on it, she was calling me and sending me pictures saying that her and [the victim had] been together.  He [had] been living with her.  And when she saw that I was reading it, she video chat[ted] with me.  So, I answered[.]

Ms. Williams explained that, when she answered Defendant's video call, Defendant showed her that Defendant was with the victim, and they were sitting together in the back of a car.  Ms. Williams hung up on Defendant, and then, the victim sent Ms. Williams a text message stating that Defendant was lying.

Ms. Williams testified that the victim later called her and said that Defendant "just put [him] out on the Expressway."  Ms. Williams agreed to pick him up, but on the way, she picked up her sister-in-law and told her about the video call.  The victim then informed Ms. Williams that he had gotten a ride from a friend, and he asked her to meet him at his cousin's house in Orange Mound.

---

[1] In the same indictment, the grand jury charged a co-defendant, Keyana Pittman, with facilitation of a felony.  However, Ms. Pittman was not tried with Defendant, and the disposition of Ms. Pittman's case is not apparent from the record.

Ms. Williams testified that, when she arrived at the victim's cousin's house, Defendant was there; Defendant was a passenger in a car driven by Keyana Pittman. Ms. Williams spoke to Defendant, and Defendant showed her additional pictures of the victim and Defendant together. Ms. Williams testified:

> So, [the victim] called me. I'm like, where you at? He like, I'm in the car. Then he was like, I'm finna pull up. I said, okay, but he saw both of us out there. He was like, why y'all outside them folks house? So, I pulled off. And [Defendant] . . . followed me to his mother['s] house.

Ms. Williams stated that, when she got to the victim's parents' house, the victim again called her and questioned why she and Defendant were outside the house. Ms. Williams told him that she just wanted her house key. Ms. Williams testified that, when she saw the car driven by the victim's friend speed off, she chased after them. She said that Defendant and Ms. Pittman, who were in Defendant's car, followed behind her. Ms. Williams testified that, as the pursuit continued, she saw the victim shoot a gun into the air twice. She then heard two gunshots coming from Defendant's car behind her. She stated that she did not see whether Defendant or Ms. Pittman fired the shots. She said that the victim told her he wanted to talk to her but that he was attempting to "lose [Defendant]."

Ms. Williams testified that, after about ten minutes of driving, the victim told her to pull over at a gas station on Getwell Road so that they could talk. When she arrived at the gas station, the victim approached Ms. Williams' car and began apologizing and saying that he "didn't want to be with [Defendant]." The victim then saw Defendant's car and said, "[G]et in the car before this crazy B jump out." Ms. Williams testified that she had known Defendant was on her way to the gas station because Defendant had called her and asked if they were "on Getwell," and Ms. Williams confirmed their location.

Ms. Williams identified a surveillance video from the gas station, which showed the confrontation and shooting. She said that, when she arrived, the victim got out of his vehicle and tried to talk to her. Ms. Williams exited her car and asked the victim for the spare key to her house and her PlayStation 4. Ms. Williams said that she was trying to retrieve her property and leave. The victim told Ms. Williams that he would meet her at her home, but Ms. Williams responded, "[N]ah, I just want my stuff."

Ms. Williams stated that, when Defendant arrived at the gas station, Defendant got out of the passenger side of her car, holding a gun in her hand. Defendant pushed the victim and began hitting him, and Ms. Pittman attacked him too. Ms. Williams said that the victim did not fight back. Ms. Williams testified that Defendant pointed the gun at the victim's face and that he jumped back and ducked. Ms. Williams then saw Defendant shoot the victim as he was walking away from Defendant. She said that, after the shooting,

she saw Defendant get back in her vehicle and that it "pulled off." Ms. Williams retrieved her cell phone and called 9-1-1. She said that the victim's friend asked her to get the victim's belongings from the back of his car, which she did.

Ms. Williams estimated that thirty to forty-five minutes had passed from the time she had seen Defendant in front of the victim's parents' house until the time Defendant shot the victim. Ms. Williams testified that she told the police that Defendant killed the victim. She also picked Defendant out of a photographic lineup and wrote Defendant's name below Defendant's photograph.

On cross-examination, Ms. Williams explained that, on August 21, she had purchased a PlayStation 4 and left it at her home with the victim. Ms. Williams said that, when she returned home around 5:00 or 6:00 p.m., however, the victim and the PlayStation 4 were gone. She began texting and calling the victim, and he told her that he was going to bring the PlayStation back to her. She said that, when she spoke to the victim around 8:00 p.m., he told her that he would be home soon, but "he never came back."

Ms. Williams testified that she had been unaware that the victim had another girlfriend. She explained that she received the first message from Defendant over Facebook messenger stating that Defendant and the victim had been in a relationship for two months and that Defendant sent her photographs of the two of them together. Ms. Williams stated that she never posted on Facebook about her relationship with the victim but that she would "tag him in stuff."

Ms. Williams testified that, when she spoke to Defendant outside the victim's cousin's house, Defendant told Ms. Williams how long she had been dating the victim, that the victim had been living with her, and that he had moved "all his stuff to her house instead of his grandparents' house." She said that, when they were outside the victim's parents' house, the victim "rode past in his friend's car." He then called Ms. Williams and asked, "[W]hy y'all outside my mother['s] house?" Ms. Williams testified that she chased after the victim because she wanted the spare key to her house and her PlayStation 4 returned.

Ms. Williams acknowledged that she told Defendant that they were on Getwell Road right before the victim asked Ms. Williams to pull over at the gas station so that they could talk. She said that, after Defendant shot the victim, she retrieved the victim's belongings from his friend's car while she was on the phone with 9-1-1. She said that her PlayStation 4 was on top of the victim's clothes in a bag and that she did not see a gun inside with his belongings. She explained that she put the bag in the back seat of her car and that police later found the gun when they "emptied the clothes out" of her vehicle.

- 4 -

Ms. Williams agreed that she sent Defendant photographs of her with the victim, which were taken inside Defendant's car on August 15, 2020, and August 19, 2020. Ms. Williams explained, however, that she had not known it was Defendant's car as the victim had told her it was his cousin's car. Ms. Williams said that, in the initial message she received from Defendant at 10:57 p.m. on August 21, 2020, Defendant said, "Girl, I'm trying to see what he telling you. Two pictures of them. What's your address so I can drop the n***a off. He got to roll." After seeing the message, Ms. Williams responded back at 11:36 p.m., "Thank you, girl. On my kids." Ms. Williams testified that she was not angry with Defendant and that they were not arguing that night.

Terrius Tappan testified that he and the victim had been friends since childhood and that they had lived close to one another. Mr. Tappan stated that, around 11:00 or 11:15 p.m. on August 21, 2020, the victim called him and asked for a ride; the victim told him that he was "on the Expressway walking." Mr. Tappan said that he picked up the victim on the Expressway and that the victim was carrying a basket of clothes, which the victim put into the back seat of Mr. Tappan's car. Mr. Tappan then drove the victim to Orange Mound, where the victim's cousin lived. He said that, after he pulled up in front of the victim's cousin's house, the victim received a call. When the victim got off the phone, he told Mr. Tappan to take him to the victim's parents' house. Mr. Tappan stated that he pulled up "down the street" from the victim's parents' house and that he and the victim could see Defendant and Ms. Williams sitting in front of the house in their cars. He recalled that the victim received another call as he drove around the block several times. Mr. Tappan said that he eventually left the area when it appeared that Defendant and Ms. Williams realized that the victim was in the car with him.

Mr. Tappan testified that the victim was on the phone with one of the two women and that he heard her say she was going to "run into [Mr. Tappan's] car[,]" so he "took off." He said that both red cars began following them. He stated that the victim had a gun and that the victim "stuck his hand out of the window" and "fired two shots in the air." Mr. Tappan then heard "two more shots" coming from behind them.

Mr. Tappan testified that, at one point, he stopped his car, and Ms. Williams caught up with them. He said that Ms. Williams got out of her car, approached his car, and began arguing with the victim. Mr. Tappan testified, "She actually hit him because she kept asking him to give her, her things[,]" but the victim refused. Mr. Tappan said that he made a "U-turn . . . drove back up the opposite side of Lamar . . . [and] made a right on Getwell[,]" when his gas light came on, and he told the victim he needed gas. Mr. Tappan recalled that he stopped at a gas station on Getwell Road and that Ms. Williams pulled up beside his car. Mr. Tappan said that, when he pulled to the front of the store, he noticed that his car was "running hot[,]" so he "popped [the] hood to check and see if all [the] antifreeze was gone."

- 5 -

He said that the victim was still arguing with Ms. Williams and that "[Ms. Williams] . . . was telling him that she wanted her stuff."

Mr. Tappan recalled that the car in which Defendant was a passenger arrived at the gas station about two minutes later. He testified that he had not known the woman driving the car but that he had seen Defendant with the victim two or three times previously. Mr. Tappan said that, upon meeting Defendant the first time, the victim told him that he was living with Defendant. Mr. Tappan stated that both Defendant and the other woman jumped out of the car and began hitting the victim. He said that Defendant hit the victim first and then the other woman "hit right after"; he said that the victim "didn't swing back at all." Mr. Tappan testified that he then saw Defendant back up, point a gun at the victim, and shoot the victim. Mr. Tappan said that he "took off running" because he did not know if Defendant was going to shoot him as well. Mr. Tappan testified, "When I took off running, [the victim] was screaming so loud that I thought [he] was directly right behind me." He said that the victim kept saying, "[S]he shot me." Mr. Tappan recalled that he ran around the corner of the store, waited about five seconds, and then ran back out to the victim. He said that, as he approached the victim, Defendant and the other woman were back in their car driving away.

Mr. Tappan testified that, prior to the night of the shooting, he had seen the victim driving both Ms. Williams' and Defendant's cars. He said that he had been unaware that the victim had ever lived with Ms. Williams. Mr. Tappan identified the store surveillance video of the incident and identified Defendant as the individual who shot the victim.

Sergeant LaTanya West of the Memphis Police Department (MPD) testified that she was the lead investigator in the victim's death and that she arrived at the scene within an hour of the shooting. Upon her arrival, Sergeant West assessed the scene, made sure that witnesses were transported to the homicide office, and asked gas station employees to pull any surveillance video from the store. Sergeant West stated that, during her investigation, she identified Defendant as being responsible for the victim's death; she explained that both Ms. Williams and Mr. Tappan identified Defendant as the shooter in a six-person, photographic lineup. Sergeant West testified that the gun used by Defendant to shoot the victim was never recovered by police. She said that, about a week after the shooting, Defendant turned herself in to authorities.

Officer Anthony Bowen testified that he worked with the MPD in the Crime Scene Investigation Unit. Officer Bowen stated that, around 2:00 a.m. on August 22, 2020, he responded to the crime scene at a gas station at the intersection of Getwell and Rhodes. He stated that the victim's body had been removed prior to his arrival. Once there, Officer Bowen drew a sketch of the crime scene, took photographs, and collected evidence, which included a spent .40-caliber shell casing and a bullet fragment.

Dr. Erica Curry testified that she was a forensic pathologist and worked as a deputy medical examiner at the Shelby County Medical Examiner's Office. Dr. Curry testified that she conducted the victim's autopsy. She stated that her examination revealed that the victim's cause of death was a gunshot wound to the back and that his manner of death was homicide. Regarding his injuries, Dr. Curry said:

> So, he had a gunshot wound that was on the right side of his back. It traveled in between two ribs on the right side. And then, it entered into his lung space and hit his right lung. And then after doing that, it hit a bone of his spine, the 12th thoracic bone of his spine; and then it hit his aorta, which is the major vessel that takes blood to and from the heart.
>
> . . . .
>
> Then it hit his liver; hit his stomach and then it hit his diaphragm on the left side, which separates your stomach organs from your chest organs; and then it went between two ribs on the right side in the front; and then it exited on his skin on the right side of his chest.

Dr. Curry said that the victim's injuries caused about 1100 milliliters of blood to accumulate around both lungs, which would have impacted the victim's ability to breathe. She further said that the path of the bullet cut the aorta almost completely into two pieces. She explained that the fracture to the bone in his spine would have affected the victim's ability to run. Dr. Curry stated that the victim had an entry wound to his back and an exit gunshot wound in the front near his left nipple. She said that she tested the victim for alcohol and common illicit and prescription drugs. She stated that the tests showed that the victim had only the metabolites of marijuana in his system.

Defendant testified that she was twenty-six years old and that she had a nine-year-old daughter. She testified that she also had a son, who was born in 2018, but that he later died from heart and lung problems. Defendant explained that her son was born with health problems and that he spent a lot of time in the hospital. She said that he passed away at home in his sleep "[f]rom his trach coming out." Defendant said that she was the only one at home with him when he died. When asked how her son's death affected her, Defendant said, "It had me like nervous all the time. Just paranoid. Always thinking what if this, what if that. Just always thinking that something is gonna happen." She said that, after her son's death, she attended grief counseling three times a week and took prescribed medications for anxiety and depression.

Defendant said that she continued to live at home with her parents for a year after her son passed away but then bought a new home. She said that, after moving out of her

parents' house, she met the victim in May 2020, and they began dating in June. Defendant explained that the victim helped cut her grass one day and "didn't go home." Defendant testified that, after the victim moved in with her, he dropped her off and picked her up from work every day and that the victim used her car because he did not own one.

Defendant testified that she discovered the victim was in a relationship with someone else on August 21, 2020, after seeing a post made by Ms. Williams on Facebook. Defendant said that she asked the victim who Ms. Williams was to him, and the victim responded that Ms. Williams was his "crazy ex." He told Defendant not to speak to Ms. Williams. However, Defendant sent Ms. Williams a photograph of her and the victim together; she also sent Ms. Williams a message that stated, "I'm trying to see what he's telling you . . . what's your address? I'll drop him off. He has to roll." Defendant said that Ms. Williams responded, "[T]hank you. On my kids." Defendant said that Ms. Williams sent her photographs of Ms. Williams and the victim together. Defendant testified that she had never met Ms. Williams and that she was not angry with her.

Defendant said that the victim began packing up his stuff and saying that "the only thing he asked was [for her] not to talk to [Ms. Williams]." The victim asked Defendant and Ms. Pittman to take him to Orange Mound. Defendant said that Ms. Pittman was driving and that she was sitting in the front passenger seat with the victim sitting behind her.

Defendant testified that, while on the Expressway, Ms. Williams asked if the victim was with her, so Defendant video-messaged Ms. Williams. Defendant testified:

> When I . . . pushed the video button, you can see me, I was sitting in the passenger side and you could see [the victim]. He was in the back and I just turned the phone like this. And he hit me in the head and . . . he took the phone and hung up the phone.

Defendant said that the victim told her, "[B]**ch, don't put me on the video." She said that she and the victim began fighting inside the car and that Ms. Pittman pulled over and told him to get out. Defendant said that, as the victim exited the vehicle, he grabbed a gun out of the sunroof. Defendant testified that she had not known that the gun was there. She said that the gun looked like one she kept at her house by her bed, so she asked the victim if the gun was hers, but he did not respond. Defendant testified that she owned a second gun, which she kept in the glove box of her car. She stated that, when the victim got out of her car, Ms. Pittman drove off before the victim could retrieve his belongings from her car.

Defendant stated that she received a call from Ms. Williams, who wanted the victim's clothes and her PlayStation. Defendant said that Ms. Williams directed her to the Orange Mound area so that Ms. Williams could collect the property. Defendant stated that, when she and Ms. Williams met in Orange Mound, Ms. Williams got "the stuff out the car" and that they began talking about how long they had been in relationships with the victim. Defendant recalled that a car drove past them quickly, and then, the victim called Ms. Williams, asking why they were at the location. Defendant said that the victim told Ms. Williams, "[D]on't worry about it. I got her."

Defendant testified that she and Ms. Pittman began to leave the area but that Ms. Williams called her again. According to Defendant, Ms. Williams said that she wanted to meet somewhere else so that they could finish talking. Defendant said that she and Ms. Pittman began following Ms. Williams but that the car in which the victim was a passenger came "back around and . . . [got] in front of [Ms. Williams]." Defendant testified that she then saw the victim sit on the edge of the passenger-side window, point a gun out the window, and fire two shots toward her. Defendant said that, in turn, she took the gun from the glove box and fired one shot from it into the air.

Defendant stated that, after she fired the gun, Ms. Pittman drove around the neighborhood trying to "get away." Defendant said that they were not familiar with the neighborhood and were "just driving around" until she received another call from Ms. Williams asking if Defendant was okay. According to Defendant, Ms. Williams wanted to meet up with the victim and confront him but that she repeatedly told Ms. Williams she did not know where they were.

Defendant claimed that, when Ms. Pittman stopped at a light, they saw the victim at a gas station. She said that Ms. Pittman "sped into the parking lot" because she was upset that the victim had shot at them. Defendant testified that she and Ms. Pittman jumped out of the car to confront the victim; she said that she was upset because the victim had hit her and had shot at her. Defendant agreed that she ran up to the victim and pushed him in the chest. She claimed that she did not intend "on doing anything to him" but acknowledged that she still had her gun in her hand when she exited the car. The following exchange then occurred:

Q. Why did you have your gun in your hand?

A. I had in my hand from when I shot it -- fired a shot back.

Q. Didn't you jump out of the car with the gun in your hand to kill him?

A. No, sir.

. . . .

Q. When did you decide to shoot him?

A. I didn't decide to shoot him.

Q. Well, you shot him, didn't you?

A. Yes, sir.

Q. Can you explain to the jury what provoked you to shoot him?

A. I didn't want to shoot him. I don't even remember shooting him.

Q. Is that what prompted you to shoot him?

A. I didn't intend on shooting him.

Q. But if you look at the video it looks like you stood back and pointed the gun and shot him. Can you explain that?

A. No, sir. I don't even remember shooting.

. . . .

Q. When did you decide to shoot him?

A. I didn't decide to shoot him.

Q. You pulled the trigger. Did you do that intentionally?

A. I didn't intend to do that to him.

Q. Did you want to kill him?

A. No, sir.

Defendant agreed that, after the shooting, she immediately left the scene with Ms. Pittman, and she did not call the police. She said that she went home and called her mother and that she later learned from her family that the victim had died. She said that she called an attorney and turned herself in several days later after a warrant was issued for her arrest.

Defendant testified that she did not know what had happened to the gun she had used in the shooting and claimed that she had left it in her car. Defendant stated that she had never shot a gun before that night.

On cross-examination, Defendant acknowledged that she was upset with the victim because he "had another girlfriend." The following exchange then took place:

Q. But you were very upset with him, right?

A. Not very upset.

Q. Oh, you weren't very upset.

A. I was upset.

Q. So, you shoot people and you're not even very upset?

A. No, ma'am.

. . . .

Q. So, you were just mildly upset when all of this happened?

A. Yes, ma'am.

Defendant acknowledged that, after the victim shot at her car, she could have used her phone to get directions back to her home. She agreed that she did not do so and that, instead, she and Ms. Pittman continued to drive around for ten to fifteen minutes. Defendant testified that she and Ms. Pittman saw the victim at the gas station by chance and said that Ms. Williams lied when she testified that she told Defendant the victim was on Getwell Road.

Defendant testified that she still had her gun in her lap when Ms. Pittman pulled into the gas station. Defendant said that she did not put the gun back into her glove box because she was afraid of the victim. Defendant agreed that she could have gone home or called 9-1-1, but she did not.

Defendant acknowledged that she got out of her car with the gun in her hand. Upon viewing the store surveillance video, Defendant agreed that she switched the gun from her left hand to her right hand as she came around her car. She said that she was right-handed but denied that she put the gun in her right hand because she intended to use it. She agreed

that the video showed she said something to the victim prior to the shooting but testified she could not recall what she said. Defendant said that she first pointed the gun at the victim's head. She pointed the gun at the victim a second time and then shot him as he was attempting to get away from her. When asked why she pointed the gun at the victim multiple times before she shot him, Defendant responded, "I don't know." She acknowledged that she shot the victim in the back and that he fell to the ground. She then got back into her car and left the scene.

Johnniesha Mattison testified that she was Defendant's sister, and she described Defendant as a "loving, caring person." Ms. Mattison testified that Defendant and the victim had always appeared to get along and that the victim had been "like a part of the family[.]"

Ms. Mattison testified that she noticed a significant change in Defendant's personality after Defendant's son died. Ms. Mattison said that Defendant "would always shut down. You know, we could barely get her on the phone unless we go over there and visit her. She didn't want to talk. She didn't want to eat. Half of the time, she just stayed in her room in the dark." She said that, to her knowledge, Defendant had never been involved in any violent confrontations prior to this incident and that Defendant did not have a propensity for violence.

Following deliberations, the jury convicted Defendant as charged, and the trial court sentenced Defendant to life imprisonment. Defendant subsequently filed a timely motion for new trial and amended motion for new trial. Following a hearing, the trial court entered a written order denying Defendant's request for a new trial. This timely appeal follows.

## II. Analysis

### A. Sufficiency of the evidence

Defendant contends that the evidence was insufficient to support her conviction for first degree premeditated murder. She argues that the evidence presented at trial "depict[ed] a chaotic and emotionally charged situation where actions were taken impulsively and without clear intention." The State responds that the evidence overwhelmingly established Defendant's guilt.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and the weight of the evidence

are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1) (2020). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (2020). Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d) (2020). Additionally, "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id.*

Premeditation "may be established by proof of the circumstances surrounding the killing." *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). These circumstances include, but are not limited to:

> the use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; any preparations to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and a defendant's calmness immediately after a killing.

*State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003) (citing *Bland*, 958 S.W.2d at 660; *State v. Pike*, 978 S.W.2d 904, 914-15 (Tenn. 1998)). This court has also noted that the jury may infer premeditation from any planning activity by the defendant before the killing, evidence concerning the defendant's motive, and the nature of the killing. *State v. Bordis*, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995) (citation omitted). In addition, a jury may

infer premeditation from a lack of provocation by the victim and the defendant's failure to render aid to the victim. *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000) *abrogated on other grounds by State v. Thomas*, 2024 WL 979852, -- S.W.3d -- (Tenn. 2024). Whether premeditation is present in a given case is a question of fact to be determined by the jury from all of the circumstances surrounding the killing. *Davidson*, 121 S.W.3d at 614 (citing *Suttles*, 30 S.W.3d at 261; *Pike*, 978 S.W.2d at 914).

Viewed in the light most favorable to the State, the evidence showed that Defendant used a deadly weapon to shoot the unarmed victim in the back as he was running away from her. Defendant got the weapon out of the glove box of her car and held it as she and Ms. Pittman drove around for ten to fifteen minutes. When they found the victim at the gas station, Defendant and Ms. Pittman jumped out of the car and began attacking the victim, but the victim did not retaliate or fight back. Defendant pointed the gun at the victim's head, said something to the victim, and then pointed the gun at him a second time. The evidence showed that Defendant was angry with the victim after learning of his relationship with Ms. Williams, and when the victim attempted to run from Defendant, she shot him, causing him to immediately fall to the ground. After shooting the victim, Defendant did not provide aid or assistance; instead, the store surveillance video shows that she calmly walked back to her car and rode away. Additionally, the jury could reasonably infer that, after killing the victim, Defendant destroyed or hid the weapon, as it was never found by police. From all this, any rational trier of fact could easily conclude that Defendant was guilty of first degree premeditated murder.

Defendant asserts in her brief that her "narrative of events seem[ed] to depict a chaotic and emotionally charged situation where actions were taken impulsively and without clear intention." However, based upon its verdict, the jury clearly rejected Defendant's testimony and accredited the testimony of the State's witnesses. *Bland*, 958 S.W.2d at 659. Defendant is not entitled to relief on this claim.

### B. Denial of a continuance

Defendant asserts that the trial court abused its discretion when it denied her request for a continuance to retain an expert to testify as to diminished capacity. She contends that she suffered from mental health problems, including depression and anxiety brought on by the death of her son, and that "[i]t was the defense's position that [she] had a nervous breakdown which would have negated the mens rea of premeditation required for first degree murder." The State responds that Defendant's continuance challenge is waived.

As noted by the State in its brief, the appellate record contains neither a written nor oral motion for a continuance of Defendant's trial. As such, the court cannot ascertain the basis for such a motion, the date upon which it was filed in relation to the start of

Defendant's trial, or the trial court's reasons for denying the continuance. Defendant has the burden of ensuring that the record conveys a fair, accurate, and complete account of what transpired with respect to those issues that are the bases of appeal. Tenn. R. App. P. 24(b); *Thompson v. State*, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997). Absent the necessary relevant material in the record, we cannot consider the merits of an issue and must "conclusively presume the judgment of the trial court was correct." *State v. Matthews*, 805 S.W.2d 776, 784 (Tenn. Crim. App. 1990). As such, this issue is waived. Moreover, Defendant has not requested plain error review or in any way persuaded the court that she has met the five criteria for plain error relief, *see State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994), and so we decline to conduct plain error review. *See e.g., State v. Moore*, No. M2015-00663-CCA-R3-CD, 2016 WL 3610438, at *8 (Tenn. Crim. App. June 28, 2016) ("As it stands, counsel has made no request for plain error review. Accordingly, we exercise our discretion and decline to conduct plain error review."), *perm. app. denied* (Tenn. Nov. 17, 2016). Defendant is not entitled to relief.

### C. Sleeping juror

Defendant contends that she was denied her right to a trial by jury based upon a juror's sleeping during trial and requests that this court review the issue for plain error. The State responds that the "sleeping juror" issue is waived and that Defendant is not entitled to plain error relief.

In her motion for new trial, Defendant asserted that "the trial court erred in failing to dismiss a juror who was noticeably asleep during defense closing arguments." However, nothing in the record suggests that Defendant made a contemporaneous objection or a request to dismiss the allegedly sleeping juror. Rule 36(a) of the Tennessee Rules of Appellate Procedure states that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." "The failure to make a contemporaneous objection constitutes a waiver of the issue on appeal." *State v. Gilley*, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008).

However, "when necessary to do substantial justice," this court may "consider an error that has affected the substantial rights of a party" even if the issue was waived. Tenn. R. App. P. 36(b). Such issues are reviewed under plain error analysis. *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010). Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *Adkisson*, 899 S.W.2d at 642. In order to be granted relief under plain error relief, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical

reasons; and (5) consideration of the error is "necessary to do substantial justice." *Adkisson*, 899 S.W.2d at 640-41; *see State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (formally adopting the *Adkisson* standard for plain error relief). When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283. Defendant bears the burden of persuasion to show that she is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

In this case, the record does not clearly establish what occurred in the trial court, *Adkisson*, 899 S.W.2d at 640-41, and nothing in the record before the court suggests that any juror was sleeping during Defendant's trial. Defendant has not met her burden of persuasion to show that she is entitled to plain error relief. *See Bledsoe*, 226 S.W.3d at 355.

### III. Conclusion

Based upon the foregoing, we affirm the judgment of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE